FILED
U.S. DISTRICT COURT

2015 MAR -9  PM 3: 34

S.D. OF N.Y.W.P.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAUREN MORELAND, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>LUMBER LIQUIDATORS, INC. a Delaware Corporation,<br><br>        Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**    JUDGE RAMOS |

# 15 CV 1754

Plaintiff Lauren Moreland by and through her attorneys Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for her class action complaint, alleges, with personal knowledge as to her own actions, and upon information and belief as to those of others, as follows:

## NATURE OF THE ACTION

1.     This  action seeks to redress Lumber Liquidators, Inc. ("Lumber Liquidators") deceptive practice of selling Chinese wood veneer laminated flooring containing toxic levels of formaldehyde ("Toxic Products"), a known carcinogen.

2.     To protect consumers, on July 7, 2010, President Obama signed the Formaldehyde Standards for Composite-Wood Products Act into law (the "FSCWP Act").  This legislation establishes limits for formaldehyde emissions from composite wood products: hardwood plywood, medium-density fiberboard, and particleboard.  The national emission standards in the FSCWP Act mirror standards previously established by the California Air Resources Board ("CARB") for products sold, offered for sale, supplied, used or manufactured for sale in California.

3.     In blatant disregard of regulations designed to protect American consumers,

Lumber Liquidators intentionally imports into the United States and sells Toxic Products that do not comply with the FSCWP Act and other formaldehyde standards.

4.     Lumber Liquidators is one of the largest and fastest growing American retailers of hardwood flooring, with over 360 stores in 46 states and revenues of more than a billion dollars a year.  Lumber Liquidators' website boasts that it provides "hardwood floors for less" and "we care too much to sell anything but the SAFEST & HIGHEST QUALITY FLOORING."

5.     However, Lumber Liquidators sells numerous brands of laminated wood veneer flooring that are manufactured in China and contain toxic levels of formaldehyde, a known carcinogen.  Although Lumber Liquidators insists its Toxic Products are safe, recent studies have proven otherwise.

6.     Indeed, a recent exposé conducted by CBS 60 Minutes revealed that Lumber Liquidators' Chinese-made laminate flooring contains amounts of toxic formaldehyde that do not meet national health and safety standards.  During the 60 Minutes segment which aired on March 1, 2015, Richard Drury, a prominent environmental attorney, who teamed up with Denny Larson, an executive director of a nonprofit group called Global Community Monitor, to test Lumber Liquidators Chinese-made laminate flooring commented, "[t]he average level in Lumber Liquidators products that we found was over six to seven times above the state standard for formaldehyde.  And we found some that were close to 20 times above the level that's allowed to be sold."

7.     In addition to testing the wood being sold in California Mr. Drury purchased 31 boxes of Chinese-made laminate flooring sold in Virginia, Florida, Texas, Illinois and New York Lumber Liquidators' stores.  With respect to that wood purchased in New York stores, Mr. Drury commented, "[w]e sent the samples for testing at two certified labs.  It turns out of the 31

samples of Chinese-made laminate flooring, only one was compliant with formaldehyde emissions standards. Some were more than 13x over the [applicable limit]. Both labs told us they had never seen formaldehyde levels that high."

8.     Dr. Philip Landrigan of New York's Mt. Sinai Hospital, who specializes in environmental pediatrics and exposure to toxic chemicals, noted that Defendant's Toxic Products are unsafe. Dr. Landrigan stated: "I would say long-term exposure at that level would be risky because it would increase the risk for chronic respiratory irritation, change in a person's lung function, increased risk of asthma. It's not going to produce symptoms in everyone but children will be the people most likely to show symptoms at that sort of level."

9.     Despite the unlawful amounts of formaldehyde contained within the Chinese-made laminate flooring sold by Lumber Liquidators, Lumber Liquidators' website promises that all of their flooring "meets or exceeds rigorous emissions standards" and represents that "we not only comply with laws, we exceed them."

10.     Whitney Tilson, a Wall Street hedge fund manager, who was interviewed for the CBS 60 Minutes exposé explained that it is purely profit that motivates Lumber Liquidators to sell products containing illegal levels of formaldehyde. When asked why Lumber Liquidators would want to purchase wood that is tainted with formaldehyde, Mr. Tilson replied, "The answer is greed. Plain and simple. Its cheaper and-- it reduces the cost by about 10 percent." Mr. Tilson further described the 10% reduction as an "enormous" amount of money.

11.     In response to CBS 60 Minutes exposé Lumber Liquidators' founder and Chairman Thomas Sullivan stated that he would "investigate" the claims against Chinese factories concerning the production of formaldehyde tainted wood sold by his company.

12.     Consumers lack the ability to test or independently ascertain the accuracy of a

household product label, especially at the point of sale. Reasonable consumers must and do rely on the company to honestly report the nature of a product's components.

13.     Household product companies intend for consumers to rely upon its representations, and reasonable consumers do in fact so rely. These representations are the only source of information consumers can use to make decisions concerning whether to buy and use such products.

14.     As a result of its false and misleading labeling, Lumber Liquidators was able to sell the Toxic Products to hundreds of thousands of consumers throughout the United States and to realize sizeable profits.

15.     By deceiving consumers about the nature, quality, and/or components of the Toxic Products as detailed herein, Lumber Liquidators was able to command a premium price for the Toxic Products. Lumber Liquidators was also motivated to mislead consumers to take away market share from competing products, thereby increasing its own sales and profits.

16.     Lumber Liquidators markets and warrants that the Toxic Products are durable, and further markets and warrants that the Toxic Products have either a twenty-five or thirty year warranty and useable lifetime.

17.     Contrary to Defendant's advertising, which it widely distributes to building professional and to the general public, the Products are not "free from defects," "extremely durable," "exceptionally durable to withstand the rigors of daily life," "meets or exceeds rigorous emissions standards," or " safe and meet the highest quality and environmental standards."

18.     The Toxic Products' various modes of failure potentially cause damage to other building components and render the Toxic Products susceptible to premature failure. Additionally, the toxic level of formaldehyde contained within the Toxic Products cause

dangerous and potentially fatal health risks.

19.    Defendant's unlawful behavior with respect to its manufacturing, marketing, and sale of the Toxic Products has caused Plaintiff and the other Class members to suffer direct financial harm.   The Toxic Products purchased by Plaintiff and the Class are markedly less valuable than Lumber Liquidator represented because of the Toxic Products' elevated level of formaldehyde.   Plaintiff and members of the Class would have paid significantly less, if they purchased the Toxic Products at all, had they known that the Toxic Products contained elevated levels of the toxin formaldehyde.

20.    Plaintiff brings this action individually and on behalf of those similarly situated to seek redress for damages caused by Defendant's wrongful conduct.

## PARTIES

21.    Plaintiff Lauren Moreland is a citizen of New York residing in Mount Kisco, New York.   In or about January 2015 Ms. Moreland purchased approximately 540 square feet of St. James Collection by Dream Home Nirvana Royal Mahogany 8mm+pad Laminate. This flooring is a Toxic Product that was manufactured in China.  Ms. Moreland purchased the Toxic Product from Lumbar Liquidators located at 132 Saw Mill River Road, Yonkers, New York 10701.  At the time of purchase, Lumber Liquidators falsely represented and warranted the flooring to be compliant with strict formaldehyde standards.   Ms. Moreland would not have purchased the product but for Defendant's deceptive conduct.

22.    Lumber Liquidators is a corporation incorporated in the State of Delaware and with its principal place of business in Toano, Virginia.   Defendant was responsible for, or otherwise involved in, the development, manufacture, marketing, sales, and distribution of the Toxic Products in New York and other locations.  Directly and through its agents, Defendant has

5

substantial contacts with and receives benefits and income from and through the State of New York.

## JURISDICTION AND VENUE

23.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy exceeds $5 million.

24.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1) in that Lumber Liquidators does sufficient business in this District to subject it to personal jurisdiction herein. Venue is also proper under 28 U.S.C. § 1391(a)(2) in that Lumber Liquidators engaged in substantial acts in furtherance of the alleged improper conduct, including Lumber Liquidators' dissemination of false and misleading information regarding the nature, quality, and/or components of the Toxic Products, within this District.

## FACTUAL ALLEGATIONS

25.     Lumber Liquidators is a multi-channel specialty retailer of hardwood flooring, and hardwood flooring enhancements and accessories, operating as a single business segment. Lumber Liquidators offers an extensive assortment of exotic and domestic hardwood species, engineered hardwoods and laminates direct to the consumer.  Lumber Liquidators also features the renewable flooring products, bamboo and cork, and provides a wide selection of flooring enhancements and accessories, including moldings, noise-reducing underlay, adhesives and flooring tools.  These products are primarily sold under Lumber Liquidators' private label brands, including the premium Bellawood brand floors.

26.     In February 2015 Plaintiff used the services of a licensed flooring contractor to install the Toxic Product in her home.  Within days of installation, Plaintiff began experiencing

noticeable physical ailments including an outbreak of a bodily rash, lethargy, sinus and nasal problems, trouble breathing, running nose and coughing. Ms. Moreland remained symptomatic until she left her home to stay with her mother. Since Ms. Moreland has left her home her symptoms have begun to improve.

27.     Additionally, on or about March 1, 2015, Ms. Moreland became aware of CBS 60 Minute exposé. Prompted by her recent health concerns, Ms. Moreland immediately began researching the allegations against Lumber Liquidators and discovered a Facebook posting listing the Chinese-manufactured laminated flooring sold by Lumber Liquidators which contained toxic levels of formaldehyde. Ms. Mooreland noticed that flooring she purchased and installed in her home, St. James Collection by Dream Home Nirvana 8mm+pad Brazilian Cherry Laminate, was contained within this list.

28.     On March 1 and 2, 2015, Plaintiff Moreland notified Lumber Liquidators of the physical ailments she was experiencing upon exposure to the Toxic Products. Initially, Ms. Moreland contacted the Lumber Liquidators store location where she purchased the Toxic Products. The store location advised Ms. Moreland that they would remediate and rectify any issues Ms. Moreland experienced with the Toxic Products. However, upon contacting Lumber Liquidators' customer service Ms. Moreland was advised that Defendant would not rectify or remediate any of the issues Ms. Moreland was experiencing with the Toxic Product.

29.     Ms. Moreland has and will incur significant expense and inconvenience as a result of the Toxic Products.

30.     On July 7, 2010, President Obama signed the Formaldehyde Standards for Composite-Wood Products Act into law (the "FSCWP Act"). This legislation, which adds a Title VI to Toxic Substances Control Act ("TSCA"), establishes limits for formaldehyde

emissions from composite wood products: hardwood plywood, medium-density fiberboard, and particleboard. The national emission standards in the FSCWP Act mirror standards previously established by the California Air Resources Board ("CARB") for products sold, offered for sale, supplied, used or manufactured for sale in California.

31.   Congress directed the Environmental Protection Agency ("EPA") to promulgate final regulations implementing the FSCWP. In May 2013, the EPA published two proposed rules. The EPA's first proposed rule sets limits on how much formaldehyde may be released from composite wood products, including hardwood plywood, medium-density fiberboard, particleboard and finished goods containing these products that are sold, supplied, offered for sale, manufactured, or imported in the United States. The proposed rules include additional implementing provisions addressing testing requirements, laminated products, product labeling, chain of custody, recordkeeping, stockpiling and enforcement.

32.   The EPA's second proposed rule establishes a third-party certification framework designed to ensure that manufacturers of composite wood products meet the TSCA formaldehyde emission standards by having their composite wood products certified though an accredited third-party certifier. Under this rule, third-party certifiers would audit composite wood panel producers and verify compliance with formaldehyde emissions standards for their products.

33.   Formaldehyde (CH2O) is a naturally occurring chemical that can be synthesized and used in certain industrial processes.

34.   Formaldehyde is classified as a volatile organic compound ("VOC"), which is a chemical that becomes a gas at room temperature. It is listed as a known human carcinogen by the National Toxicology Program and the International Agency for Research on Cancer and is

associated with myriad other adverse medical conditions even in short term exposure, including asthma and rheumatoid arthritis.

35.     According to the U.S. Occupational Safety & Health Administration ("OSHA"):

> [t]he concentration of formaldehyde that is immediately dangerous to life and health is 100 ppm. Concentrations above 50 ppm can cause severe pulmonary reactions within minutes. These include pulmonary edema, pneumonia, and bronchial irritation which can result in death. Concentrations above 5 ppm readily cause lower airway irritation characterized by cough, chest tightness and wheezing.

> Long term exposure has been linked to an increased risk of cancer of the nose and accessory sinuses, nasopharyngeal and oropharyngeal cancer, and lung cancer in humans.

36.     Formaldehyde has a pungent odor and irritates the respiratory tract. The most common symptoms of formaldehyde exposure are burning eyes, nose and throat irritation, coughing, headaches, dizziness, joint pain, and nausea. Due to the harmful effects of formaldehyde on human health, various laws have been enacted to reduce consumers' exposure to this toxin.

37.     Wood flooring can contain formaldehyde because formaldehyde is often used in the adhesives and resins used to make engineered wood floors. Formaldehyde can be released into the air (through a process called "off-gassing") from wood flooring materials.

38.     According to the Consumer Product Safety Commission ("CPSC"), pressed-wood (i.e., hardwood plywood, particleboard, and medium-density fiberboard ("MDF")) and wood based products, especially those containing urea-formaldehyde (or "UF") resins, may be "a significant formaldehyde source."

39.     Many, if not all, of Lumber Liquidators' Toxic Products contain UF/urea-formaldehyde or other formaldehyde resins. For example, the Material Safety Data Sheet for

Lumber Liquidators' Morning Star Bamboo Flooring states: "This product is composed of bamboo fibers bonded together with urea formaldehyde (UF) resins/UF makes up 10-11% of the product.

40.    Chinese-sourced wood products (including Lumber Liquidators' Chinese manufactured flooring products) are particularly associated with excess formaldehyde levels.

41.    One study, entitled "Formaldehyde in China: Production, consumption, exposure levels, and health effects" Environment International 35 (2009) 1210-1224, found that over the last 20 years, China's formaldehyde industry has experienced unprecedented growth, and now produces and consumes one-third of the world's formaldehyde. More than 65% of the Chinese formaldehyde output is used to produce resins which are mainly found in wood products. These are also the major source of indoor air pollution in China. The study documented numerous instances of hazardous occupational exposure to formaldehyde in Chinese wood workers.

42.    The Chinese government imposes virtually no regulations governing formaldehyde in wood products. As a result, wood sourced from China is not subject to the strict environmental regulations that would govern such wood products manufactured in the United States. Thus, Chinese wood products containing formaldehyde can be manufactured more cheaply than products made in the United States, but the products are also unsafe.

43.    As stated above, the United States statute that governs permissible formaldehyde emissions, the Formaldehyde Standards for Composite Wood Products Act of 2010, 15 U.S.C. 2697 (the "Formaldehyde Standards Act"), was signed into law on July 7, 2010. The Formaldehyde Standards Act adopted the standards established by CARB as a nationwide standard.

44.    Lumber Liquidators' marketing materials, including the Company's website,

specifically represent to consumers that Lumbar Liquidators' Chinese-manufactured products comply with the formaldehyde emission regulations propounded by CARB:

> Lumber Liquidators' products are safe and meet the highest quality and environmental standards. That's why we sell these products, why we use them in our own homes and why we are a market leader. As consumers ourselves, we are committed to delivering safe and long-lasting products to our customers.
>
> ***Our commitment begins with meeting the most stringent environmental and quality standards. These standards ensure that our products are safe, meet all government requirements, and are approved by government-approved third-party validators.*** (emphasis added).
>
> ***This commitment to quality and safety extends to everywhere we do business. We require that all of our suppliers comply with California's advanced environmental requirements, even for products sold outside California.*** (emphasis added).
>
> Lumber Liquidators offers many types of flooring. Like other flooring retailers, some of these options may utilize glues containing formaldehyde which can also be found in other fabricated household items such as paneling, cabinetry, and furniture. Formaldehyde, which exists naturally in the environment, is also found in permanent press fabrics, bath oils, bubble bath, and an array of cosmetics, deodorants, fingernail polishes and *shampoos. **Our commitment to the health and safety of our customers includes meeting or exceeding industry standards on formaldehyde emissions through compliance with applicable regulations such as those established by the California Air Resources Board (CARB).*** (emphasis added).
>
> The CARB emission standards apply to certain components of most laminate and engineered flooring and accessories. ***The CARB regulation does not apply to the Lumber Liquidators manufacturing process or to the finish applied to solid hardwood flooring (including Bellawood), solid bamboo, or vinyl flooring.*** (emphasis added).
>
> **Does Lumber Liquidators comply with CARB regulations?**
>
> Yes. To comply with the CARB standards, applicable laminate and engineered flooring and accessories sold by Lumber Liquidators are purchased from manufacturers whose production methods have

been certified by a Third Party Certifier approved by the State of California to meet the CARB standards; or from suppliers who source composite wood raw materials only from certified manufacturers. The scope of the certification by the Third Party Certifier includes the confirmation that the manufacturer has implemented the quality systems, process controls, and testing procedures outlined by CARB and that their composite wood products conform to the specified emission limits. The Third Party Certifier also provides ongoing oversight to validate the manufacturers' compliance and manufacturers must be periodically re-certified.

45.     Moreover, Lumber Liquidators' Purchase Order Terms and Conditions, which are

readily available on the Lumber Liquidators' website, provide the following warranties:

SELLER'S WARRANTIES: Seller expressly warrants that all goods covered by this Purchase Order will: (a) strictly conform to Seller's specifications, drawings, samples and other written materials and descriptions (b) be free from defects in design, material and workmanship; (c) be of merchantable quality and suitable for the particular purposes intended, whether express or reasonably implied; and (d) bear all warnings, labels, and markings required by applicable laws and regulations. In addition, Seller warrants that: (e) none of the goods covered hereby, to the extent they are subject to laws prohibiting adulteration or misbranding, is adulterated or misbranded within the meaning of such laws as of the date of delivery to Lumber Liquidators; (f) all goods covered hereby may be introduced into the stream of commerce without violation of applicable laws and regulations; and (g) all goods furnished or supplied pursuant to this Purchase Order have been sourced, produced, sold, delivered, declared, packaged, labeled, manufactured, and/or rendered to Lumber Liquidators in compliance with all applicable laws, codes and regulations.

46.     This warranty applies to all Lumber Liquidators' products.

47.     In addition, each of Lumber Liquidators' products is covered by a warranty

stating that the flooring will be free from defects. For example, the Mayflower Engineered

Limited Warranty states that: "Rest assured; every one of our floors is carefully monitored

during production by experienced Quality Control Engineered *to ensure it's free of defects*.

What's more, *each floor is finely crafted to exacting manufacturing standards* so it will bring

warmth and beauty to your home year after year. Simply put, you can rest easy knowing exceptional quality went into your floor – well before our good name went on the box." (emphasis added.)   Each of the warranties at issue here contains the same, or substantially similar, statements representing that the products are "free of defects."

48.     Contrary to Lumber Liquidators' repeated, detailed representations and warranties, however, its Chinese-manufactured flooring products off-gas formaldehyde at the time of purchase at levels that far exceed the standards propounded by CARB resulting in harm to Plaintiff and the other Class members who purchased these products.

49.     The truth regarding Lumber Liquidators' flooring began to emerge on June 20, 2013, when blogger Xuhua Zhou ("Zhou") of the website Seeking Alpha first published the results of his independent investigation of the formaldehyde levels present in Lumber Liquidators' flooring.

50.     Zhou's article alleged that, among other things, testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5x the maximum legal limit even though the product was labeled as being CARB-compliant.

51.     On March 1, 2015, CBS 60 Minutes aired a segment which revealed that Lumber Liquidators' Chinese-made laminate flooring contains amounts of toxic formaldehyde that do not meet national health and safety standards.   During the 60 Minutes segment, Richard Drury, a prominent environmental attorney, who teamed up with Denny Larson, an executive director of a nonprofit group called Global Community Monitor, to test Lumber Liquidators Chinese-made laminate flooring commented, "[t]he average level in Lumber Liquidators products that we found

13

was over six to seven times above the state standard for formaldehyde. And we found some that were close to 20 times above the level that's allowed to be sold."

52. Lawmakers have begun acting against Lumber Liquidators' unlawful conduct. For example, on March 4, 2015, U.S. Senator Bill Nelson requested that three federal agencies investigate Lumber Liquidators. On March 4, 2015, Senator Nelson sent a letter to the Consumer Product Safety Commission, the Center for Disease Control and Prevention, and the Federal Trade Commission in which he called for independent testing of the laminate flooring to see if it potentially poses a health risk to the public. "Because this could affect millions of homeowners it is imperative we get some answers quickly." Nelson said. A statement from the Senate Committee on Commerce, Science and Transportation said that Senator Nelson also wants to know if Lumber Liquidators made potentially false marketing claims about the flooring's compliance with a California formaldehyde safety standard.

53. Lumber Liquidators continues to misrepresent that its Chinese-manufactured flooring products are CARB compliant when it knew that this was false, downplayed the formaldehyde off-gassing defect of the Toxic Products and failed to properly investigate and inform customers regarding the formaldehyde emissions problems associated with its products.

54. Had Defendant adequately and fairly represented its products, Plaintiff and the other Class members would not have purchased these products and/or would have paid less money for them.

55. Lumber Liquidators' flagrant violations of law and systemic warranty breaches have caused, and will continue to cause, significant financial harm to Plaintiff and the other Class members.

56. Plaintiff and the Class have been damaged by Defendant's dangerous and

deceptive Toxic Products.  Plaintiff and the Class are entitled to a return of the full purchase

price paid for Toxic Products and other damages to be proven at trial.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3),

individually and on behalf of all others similarly situated.

58.     The Class that Plaintiff seek to represent are defined as:

> All persons and entities in New York who purchased and installed
> wood flooring from Defendant either directly or through an agent,
> that was sourced, processed, or manufactured in China and that
> contains formaldehyde emissions that exceed applicable standards.

59.     Excluded from the Class is Lumber Liquidators, its affiliates, employees, officers

and directors, persons or entities that distribute or sell Lumber Liquidators flooring, the Judge(s)

assigned to this case and the attorneys of record in this case.

60.     Plaintiff does not assert claims in this action for personal injuries caused by

formaldehyde exposure through the Toxic Products in question here.  Rather, Plaintiff,

individually and on behalf of the other Class members, seek solely economic and injunctive

relief as a result of the purchase of Lumber Liquidators' Toxic Products.

61.     The members of the Class are so numerous that joinder of all members would be

impracticable. The proposed Class likely includes more than 10,000 members. The precise

numbers of members can be ascertained through discovery, which will include records of

Lumber Liquidators' sales, its warranty service, and other records and documents.

62.     There are common questions of law and fact that predominate over any questions

affecting only individual Class members.  These common legal and factual questions, include,

but are not limited to:

a.     Whether Lumber Liquidators' Toxic Products emit excessive levels of

formaldehyde;

b.      Whether Lumber Liquidators represented and warranted that its Toxic Products complied with their label descriptions;

c.      Whether Lumber Liquidators omitted and concealed material facts from its communications and disclosures to Plaintiff and the other Class members regarding the illegal sourcing of its Toxic Products;

d.      Whether Lumber Liquidators breached its express or implied warranties to Plaintiff and the other Class members with respect to its Toxic Products;

e.      Whether Defendant was negligent in its labeling and advertising of the Toxic Products;

f.      Whether Defendant unlawfully sold the Toxic Products in violation of the laws of New York;

g.      Whether Defendant's unlawful, unfair and deceptive practices harmed Plaintiff and the Class;

h.      Whether, as a result of Lumber Liquidators' conduct, Plaintiff and the other Class members have suffered damages; and if so, the appropriate measure of damages to which they are entitled; and

i.      Whether, as a result of Lumber Liquidators' misconduct, Plaintiff and the other Class members are entitled to equitable relief and/or other relief, and, if so, the nature of such relief;

j.      Whether Defendant engaged in unlawful, unfair or deceptive business practices by failing to properly label its products sold to consumers;

k.      Whether the products at issue were mislabeled as a matter of law and violated California CARB emissions standards and Formaldehyde Standards of Composite Wood Products in the Toxic Substances Control Act, 15 U.S.C. 2601 *et. seq.*;

l.      Whether Defendant was unjustly enriched by its deceptive practices;

m.      Whether Defendant engaged in mail and wire fraud;

n.      Whether Defendant engaged in a pattern of racketeering activity;

o.      Whether the Lumbar Liquidators' Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4);

p.      Whether Defendant conducted or participated in the affairs of the Lumbar Liquidators' Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

q.      Whether punitive damages should be awarded;

r.      Whether Defendant should be enjoined from continuing the conduct complained of herein.

63.      Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and each of the other Class members have been injured by the same wrongful practices of Lumber Liquidators. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

64.      Plaintiff will fully and adequately assert and protect the interests of the other Class members. In addition, Plaintiff has retained class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiff nor her attorneys have any interests contrary to or conflicting with other Class members' interests.

65.      A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the other Class members' claims is economically infeasible and procedurally impracticable. While the damages sustained by Class members in the aggregate are substantial, the individual damages incurred by each Class member may be too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Further, individual Class members do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual

17

and legal issues.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

66.    Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

67.    In addition, Lumber Liquidators has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the Class members as a whole is appropriate.

68.    Plaintiff does not anticipate any difficulty in the management of this litigation.

69.    Any manageability concerns can be adequately addressed through various means available to the Court.

70.    Lumber Liquidators has, or has access to, addresses and other contact information for the Class members, which may be used for the purpose of providing notice of the pendency of this action.

## CLAIMS ALLEGED

## COUNT I

### (Violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961, *et seq.* – Formaldehyde)

71.    Plaintiff incorporates by reference preceding paragraphs as if fully set forth herein.

72.    Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

73.    The Racketeering Influenced and Corrupt Organizations Let ("RICO") provides:

It shall be unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct o such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

74.     The relevant time period for Defendant's pattern of racketeering stems from at least the year 2009, and likely earlier but at this point in discovery as yet unknown, and continues through the date of the filing of this action and remains ongoing.

75.     Defendant is a "person(s)" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

## THE RICO ENTERPRISE

76.     Defendant has used an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), to carry out the pattern of racketeering activity based on the wrongful conduct alleged herein.

77.     This enterprise consists of Lumber Liquidators, third party certifiers of CARB compliance, Chinese entities, and other entities that were associated together for the common purpose of importing into the United States and selling to consumers falsely advertised Toxic Products which failed to comply with applicable formaldehyde standards.

78.     This Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships between the entities with sufficient longevity to permit and enable pursuit of the Enterprise's purpose and long-term objectives through a continuous course of conduct that affects to affect interstate and foreign commerce.

79. The Enterprise exists separate and apart from its pattern of racketeering activity, because Defendant and the Enterprise have multiple goals, not all of which are illegal. The lawful activity engaged in by members of the Enterprise includes ongoing partnerships to purchase, import, export, distribute, sell, and process wood flooring products that have entered the United States and are sold in the United States in compliance with their labels. Defendant however, has, since at least 2009, used this Enterprise to conduct the related acts of mail and wire fraud comprising the pattern of racketeering.

80. Defendant is a "person" under the civil RICO statue because it knowingly conducted and participated in the conduct, the management, and the operation of the Enterprises' affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

81. Defendant engaged in such unlawful conduct by using the Enterprise to further their scheme of causing false and misleading information on the Toxic Products' labels to be disseminated by mail, interstate wires, or interstate carriers.

82. Defendant sought to maximize their profit through a pattern and practice of misrepresentation and concealment of the formaldehyde levels contained in the Toxic Products in violation of applicable laws and regulations.

### The RICO Predicate Acts and Pattern of Racketeering Activity

83. Defendant has conducted, participated in, and operated its business through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

84. Defendant has done so with the purpose of warranting, labeling, and selling its Toxic Products as CARB compliant, when they knew such representations were false. Defendant made those false representations to enhance its profits.

20

85. Defendant's false importation, manufacture, labeling, and sale of its Toxic Products have been part of a deliberately orchestrated scheme to enrich Defendant through increased sales of mislabeled and non-compliant wood flooring products at the expense of defrauded purchasers, including Plaintiff and the other Class Members.

86. Defendant intended to and did profit from its sales of the Toxic Products before its customers, the public, and the United States Government learned that the flooring products had been falsely marketed, manufactured and purveyed.

87. Defendant carried out its scheme in interstate and foreign commerce, making extensive use of the United States mail and wire services to orchestra its deceptive and unfair sales transactions and promote its sales in the United States.

88. In violation of 18 U.S.C. § 1001, and in furtherance of its unlawful scheme, Defendant has repeatedly and systematically prepared false invoices, letters, labels, and/or other papers that purposefully misstate the CARB compliance of its Chinese-manufactured wood flooring products.

89. In violation of 18 U.S.C §§ 542 and 545, Defendant submitted these false documents to governmental officials, current and prospective customers, and end-users for the purpose of concealing the formaldehyde emissions of its products and introducing those products into interstate commerce.

90. In violation of 18 U.S.C. § 1341, Defendant, on more than two occasions during the last ten years, used the mails and the services of private or commercial interstate carriers in furtherance of schemes to manufacture, sell and falsely market the Toxic Products.

91. Specifically, Defendant mailed, to current and prospective customers, and to others for reproduction and distribution, solicitations, labels, or invoices for the Toxic Products

that affirmatively misstated, or that failed to state under circumstances that have a tendency to mislead, the Toxic Products' level of CARB compliance.

92.     Defendant has exclusive possession, custody, and control over the documents and other evidence reflecting the aforementioned mailings.

93.     In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the last ten years, used the interstate and international wires to transmit purchase orders of its Chinese suppliers for mislabeled Toxic Products.

94.     In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the last ten years, used the interstate and international wires to transmit instructions to its Chinese suppliers or intermediaries regarding the shipment of mislabeled Toxic Products.

95.     In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the past ten years, used the interstate wires to transmit or convey quotations for Toxic Products to customers, which misrepresent the formaldehyde emissions of these products.

96.     With the exception of the wire transmissions referenced herein, Defendant has exclusive possession, custody and control over most documents and other evidence reflecting the aforementioned wire transmissions.

### Relatedness and Continuity of the Racketeering Activity

97.     The foregoing enterprise existed and operated continuously since at least 2009 and likely goes back much further.  The enterprise can be expected to continue indefinitely and in the same pattern of racketeering activity, unless this Court intervenes.

98.     Defendant's predicate acts have been so numerous and concerted as to establish the continuity necessary to constitute a pattern and practice of racketeering activity in furtherance of Defendant's scheme, as alleged herein.

22

99.   Defendant's predicate acts are related, in that each act has been designed to further, and has been an integral part of, Defendant's scheme, and has been intended to achieve its unlawful purpose.

100.   The activities of Defendant's enterprise have had a significant impact upon interstate and foreign commerce; millions of dollars' worth of mismarked or mislabeled Toxic Products have been manufactured by Lumber Liquidators outside of the United States and shipped in interstate and foreign commerce to Defendant's retail stores and, eventually, to its customers.

101.   Defendant's communications with and payments to the Chinese timber processors and their intermediaries have moved in interstate and foreign commerce.

102.   Defendant has derived substantial income from its scheme alleged herein.

103.   As set forth above, Defendant and its co-conspirators have devised, set in motion, and brought to fruition schemes, namely: willfully and knowingly misrepresenting material facts regarding the character and quality of Defendant's Toxic Products for the purposes of allowing the shipment and importation of these products and for the purposes of inducing customers to purchase them.

104.   Consumers, purchasers, and other third parties relied on Defendant's scheme, resulting in harm to Plaintiff and the other Class members.

105.   Plaintiff has been damaged by Defendant's mailing or wire transmissions of solicitations that fail to disclose the lack of CARB compliance of Defendant's Toxic Products. Plaintiff was injured as a result of purchasing the products.

## COUNT II

### (Violation of the Magnuson-Moss
### Warranty Act, 15 U.S.C. §§ 2301, *et seq.* – Formaldehyde)

106.    Plaintiff incorporates by reference preceding paragraphs as if fully set forth herein.

107.    Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

108.    Plaintiff and the other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

109.    Lumber Liquidators is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

110.    Lumber Liquidators flooring purchased separate from the initial construction of the structure constitutes a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

111.    Lumber Liquidators' express warranties and written affirmations of fact regarding the nature of the flooring, including that the flooring was free from defects and was in compliance with CARB formaldehyde standards and all other applicable laws and regulations constitute written warranties within the meaning of 15 U.S.C. § 2301(6).

112.    Lumber Liquidators breached their warranties by:

a.    Manufacturing, selling and/or distributing flooring that exceeds the CARB formaldehyde standards;

b.    Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

c.    Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

24

113.    Lumber Liquidators' breach of its express warranties deprived Plaintiff and the other Class members of the benefits of their bargains.

114.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

115.    Plaintiff, on behalf of herself and the other Class members, have notified Defendant of its breach of written warranties and Defendant has failed to adequately cure those breaches.  As a direct and proximate result of Lumber Liquidators' breaches of its written warranties, Plaintiff and the other Class members sustained damages in an amount to be determined at trial.  Lumber Liquidators' conduct damaged Plaintiff and the other Class members, who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## COUNT III

### (For Breach of Express Warranty -- Formaldehyde)

116.    Plaintiff incorporate by reference preceding paragraphs as if fully set forth herein.

117.    Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

118.    Lumber Liquidators warranted that its flooring was free of defects when it sold those products to Plaintiff and the members of the Class.

25

119.    Defendant further represented that its flooring products complied with CARB formaldehyde standards and all applicable laws and regulations.  Plaintiff and members of the Class reasonably relied upon these representations.

120.    The Defendant's description on the labeling of the Toxic Products that it complied with CARB and California emissions regulations became part of the basis of the bargain, creating express written warranties that the product purchased by Plaintiff and the other Class Members would conform to Defendant's description and specification. The Toxic Products purchased by Plaintiff did not so conform.

121.    Lumber Liquidators breached their warranties by:

a.    Manufacturing, selling and/or distributing flooring that exceeds the CARB formaldehyde standards;

b.    Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

c.    Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

122.    Plaintiff, on behalf of herself and the other Class members, provided Lumber Liquidators with timely notice of its breach of warranty.  Lumber Liquidators was also on notice regarding the excessively high levels of formaldehyde in its flooring from the complaints and requests for refund it received from Class members, Internet message boards and from published product reviews.

123.    As a direct and proximate result of Lumber Liquidators' misconduct, Plaintiff and the other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale.  Additionally, Plaintiff and the other Class members have either incurred or will incur economic damages at the point of

repair in the form of the cost of repair and/or the cost of purchasing non-defective flooring to replace the Lumber Liquidators' flooring.

124. Plaintiff and the other Class members are entitled to legal and equitable relief against Lumber Liquidators, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT IV

### (For Breach of Implied Warranty of Merchantability)

125. Plaintiff incorporates by reference preceding paragraphs as if fully set forth herein.

126. Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

127. At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used and that the product be acceptable in trade for the product description.

128. Defendant breached its duty by selling flooring to Plaintiff and the other members of the Class that was not merchantable.

129. Defendant was notified that its product was not merchantable within a reasonable time after the defect manifested itself to Plaintiff and the members of the Class.

130. Likewise, implied in the purchase of the Toxic Products by Plaintiff and the Class is the warranty that the purchased products are legal and can be lawfully sold and possessed.

131. Defendant reasonably knew or should have known that those Toxic Products were unlawful for sale pursuant to The Toxic Substance Control Act, 15 U.S.C. 2601, *and et. seq.*

132.    When Defendant sold these products it impliedly warranted that the products were legal and could be lawfully possessed and/or sold and therefore, merchantable.

133.    No reasonable consumer would knowingly purchase a product that is illegal to own or possess.

134.    The purchased Toxic Products are unfit for the ordinary purposes for which it was intended.

135.    In fact, the Toxic Products are illegal, mislabeled and economically worthless.

136.    As a result of the non-merchantability of Lumber Liquidators' flooring described herein, Plaintiff and other members of the Class sustained a loss or damages as a result of their purchase of unsuitable, useless, illegal and unsellable products.

## COUNT V

### (Violation of NY General Bus. Law §§ 349 *et seq.*)

137.    Plaintiff incorporates by reference preceding paragraphs as if fully set forth herein.

138.    Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

139.    This action is brought to secure redress for the unlawful, deceptive and unfair trade practices perpetrated by Lumber Liquidators on behalf of Plaintiff and the Class members.

140.    Plaintiff and Class Members are consumers and as owners of Defendant's products, they are the end users and intended beneficiaries of said products.

141.    As a seller of flooring products to the consuming public and whose conduct affects similarly situated consumers and has a broad impact on consumers at large, Defendant is engaged in consumer-oriented conduct within the intended ambit of GBL § 349.

142.    Defendant's actions and/or omissions as described herein violated GBL § 349 *et seq.*, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

143.    Specifically, Defendant  knowingly misrepresented and intentionally omitted material information affecting the value of the Lumber Liquidators' Toxic Products.

144.    Defendant's  misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression, or omission of materials facts with the intent that others rely on such concealment, suppression, or omission in connection with the sale and use of Defendant's flooring in violation of GBL § 349 *et seq.*

145.    Defendant violated GBL § 349 by knowingly and falsely representing that Defendant's Toxic Products were fit to be used for the purpose for which they were intended, when Defendant knew they were defective, unreliable, and unsafe and by other acts alleged herein.

146.    Defendant's deceptive and misleading actions and omissions as set forth herein have caused and continue to cause injury to Plaintiff and the Class Members.

147.    New York has enacted statutes to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices such as those alleged in this Complaint.

148.    As a direct and proximate result of Defendant's violations of GBL § 349, Plaintiff and the Class members have suffered and continue to suffer damages.  Plaintiff and the Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## COUNT VI

### (Unjust Enrichment)

149.    Plaintiff incorporates by reference preceding paragraphs as if fully set forth herein.

150.    Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

151.    As a result of Defendant's unlawful and deceptive actions described above, Defendant was enriched at the expense of Plaintiff and the Class through the payment of the purchase price for the Toxic Products.

152.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that they received from Plaintiff and the Class, in light of the fact that the Toxic Products purchased by Plaintiff and the Class were illegal products and were not what Defendant represented them to be. Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to the Plaintiff and the Class for the monies paid to Defendant for the Toxic Products.

## COUNT VII

### (Negligence)

153.    Plaintiff incorporate by reference preceding paragraphs as if fully set forth herein.

154.    Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

155.    In making representations of fact to Plaintiff and the other Class members about their Toxic Products, Defendant failed to lawfully label or advertise their

Toxic Products and violated their duties to disclose the material facts alleged above. Among the direct and proximate causes of said failure to disclose were the negligence and carelessness of Defendant.

156. Plaintiff and the other Class members, as a direct and proximate cause of Defendant's breaches of its duties, reasonably relied upon such representations to their detriment. By reason thereof, Plaintiff and the other Class members have suffered damages.

157. As described above, Defendant's actions violated New York and Federal law designed to protect Plaintiff and the Class. Defendant's illegal actions constitute negligence per se. Moreover, misbranding provisions violated by Defendant are strict liability provisions.

158. As alleged above, Plaintiff and the Class were injured by Defendant's unlawful actions and are entitled to recover an amount to be determined at trial due to the injuries and loss they suffered as a result of Defendant's negligence.

## **REQUEST FOR RELIEF**

159. WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor as follows:

    a. certifying the Class and appointing Plaintiff and her counsel to represent the Class;

    b. declaring that Lumber Liquidators is financially responsible for notifying all Class Members about the defects described herein;

    c. enjoining Lumber Liquidators from further deceptive sales practices with respect to Lumbar Liquidators' flooring;

    d. awarding Plaintiff and the other members of the Class their actual damages, consequential damages, specific performance, and/or rescission;

    e. directing Lumber Liquidators to repair and/or replace all defective and/or misbranded flooring at no cost to the Class members;

f.   awarding Plaintiff and the other Class members pre-judgment and post-judgment interest;

g.   awarding Plaintiff and the other Class members reasonable attorneys' fees and costs of suit, including expert witness fees;

h.   awarding Plaintiff and the other Class members punitive damages, where authorized;

I.   granting leave to amend the Complaint to conform to the evidence produced through discovery and/or at trial; and

J.   awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims in this action.

DATED:   March 9, 2015
          White Plains, New York

                              By:   _____
                                    Jeremiah Frei-Pearson
                                    D. Greg Blankinship
                                    Todd S. Garber
                                    **FINKELSTEIN, BLANKINSHIP,**
                                    **FREI-PEARSON & GARBER, LLP.**
                                    1311 Mamaroneck Avenue
                                    White Plains, New York 10605
                                    Telephone: (914) 298-3281
                                    Fax: (914) 824-1561
                                    jfrei-pearson@fbfglaw.com
                                    gblankinship@fbfglaw.com
                                    tgarber@fbfglaw.com

                                    *Counsel for Plaintiff and the Class*